[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-10404

Non-Argument Calendar

_____

JASPAL SINGH,

Petitioner,

*versus*

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
Agency No. A216-176-588

_____

Before WILSON, JORDAN, and ROSENBAUM, Circuit Judges.

PER CURIAM:

Jaspal Singh, proceeding *pro se*, seeks review of an order of the Board of Immigration Appeals affirming an immigration judge's denial of his application for asylum, withholding of removal, and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment. Mr. Singh contends that the BIA erred in affirming the IJ's adverse credibility determination. He also claims that the BIA erred in affirming the IJ's decision that he failed to provide sufficient evidence to rehabilitate his allegedly inconsistent testimony. Finally, he asserts that the BIA failed to consider his evidence to support his claims for withholding of removal and CAT. After review of the record and the applicable law, we deny the petition. [1]

I

Mr. Singh, a native and citizen of India, entered the United States without valid documentation on or about December 13, 2017. In January 2018, the Department of Homeland Security served him with a notice to appear, charging that he was removable under INA § 212(a)(7)(A)(i)(I), 8 U.S.C. § 1182(a)(7)(A)(i)(I), for being an immigrant without valid documentation at the time of

---

[1] We assume the parties' familiarity with the record and set out only what is necessary to explain our decision.

application for admission, and under INA § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i), for being "an alien present in the United States without…admi[ssion] or parole[]. Mr. Singh admitted to the allegations in the NTA and conceded removability as charged.

Mr. Singh subsequently filed for asylum and withholding of removal under the INA. *See* 8 U.S.C. §§ 1158, 1231(b)(3). He also requested relief under the Convention Against Torture. *See* 8 C.F.R. § 208.16(c).

## A

In his Form I-589, Mr. Singh, who identifies as Sikh, explained that he "had to leave India to save [his] life from the pro-Hindu political party, Bhartiya Janta Party (BJP)," because of his "association with the Shiromani Akali Dal Mann party (SADM)," which advocated for a separate state for Sikhs. According to Mr. Singh, this religious and political tension resulted in violence. He alleged that members of the BJP threatened and beat him on two separate occasions because of his affiliation with the SADM party.

The first attack occurred on June 2, 2017, on his way home from a SADM party meeting. Members of the BJP assaulted him with hockey sticks until his screams summoned bystanders who came to his aid. Mr. Singh recalled hearing his attackers say "long live BJP" as they left him on the ground. He then went to the hospital to treat his injuries. The day after this attack, Mr. Singh went with his uncle to the police station to report the attack, but

the only action he claims they took was to threaten him with jail for reporting a "false case."

The second attack occurred on September 20, 2017, in the village of Kangan, where the SADM party had organized an eye check-up camp for its members. On his way home, Mr. Singh encountered members of the BJP who were allegedly not pleased that Mr. Singh continued to work for the SADM party despite their threats. Again, they beat Mr. Singh, causing him to bleed from his mouth. Mr. Singh claims one of his attackers then told another attacker to grab a knife so they could kill him and make it look like a suicide. Luckily, SADM party members arrived on the scene before the alleged plan (and Mr. Singh) could be executed. BJP members fled, but not before warning Mr. Singh that "they would not sp[a]re [him] next time." Mr. Singh did not report this incident to police because he claims he was afraid given his last encounter with them. He did, however, go to the doctor to treat his injuries.

In support of his application, Mr. Singh submitted three affidavits and two medical reports. [2]

His wife, Narinder Kaur, provided the first affidavit. She confirmed that Mr. Singh had been a member of the SADM party since October of 2016. Narinder also corroborated Mr. Singh's ac-

---

[2] Some of the individuals who provided affidavits in support of Mr. Singh's claims have the same last names. To avoid confusion, we will refer to these individuals by their first names.

counts of the two attacks. She claimed that BJP members first attacked her husband with hockey sticks outside his shop on June 2, 2017. Bystanders who heard Mr. Singh's screams came to his aid, including their neighbor, Sukhwinder Singh. Her husband and his uncle then went to the police to report the attack, but the police threatened to "frame him" for filing a "false case."

The details in her affidavit were also consistent in describing the second attack. She said six BJP members attacked Mr. Singh on September 20, 2017, as he was returning home from a SADM event in Kangan. Those BJP members beat him so badly that they caused him to bleed from his mouth. One of the assailants told another to get a knife but they were run off by SADM members who came to her husband's aid. As they fled, BJP members warned Mr. Singh that they would not "spare him next time." Mr. Singh went to the hospital to receive treatment for his injuries. A.R. 213–14.

In addition to offering details that matched Mr. Singh's accounts of the two attacks and the tension between the SADM party and the BJP, Narinder noted that her husband was "targeted due to his political opinion and membership" in the SADM party, and that she "deeply fear[ed] he will be killed upon a forced return to India." A.R. 215. Even after Mr. Singh fled to the United States, Narinder recalls that the BJP and the police came to her home on July 18, 2018 and threatened to kill Mr. Singh if and when they found him.

The second affidavit was offered by Jaswinder Kaur, a village leader from Mr. Singh's and Narinder's village. She too recounted the attacks perpetrated by the BJP on Mr. Singh with detailed accuracy. Jaswinder corroborated the dates, nature, and aftermath of both attacks.  Jaswinder also confirmed that members of the BJP went to find Mr. Singh at his home and threatened his wife.

The third affidavit came from Mr. Singh's neighbor, Sukhwinder Singh. Sukhwinder confirmed many of the same details that Jaswinder and Narinder provided in their affidavits about Mr. Singh's affiliation with the SADM party and his violent encounters with the BJP. Of note, Sukhwinder recounted how upon hearing cries for help, he came to Mr. Singh's aid during the first attack and personally witnessed members of the BJP retreat from the scene.

In addition to these three consistent and detailed affidavits, Mr. Singh submitted two medical reports. The first was dated July 12, 2018, that confirmed he received treatment on June 2, 2017, the day of the first attack by BJP members. Mr. Singh submitted a separate medical report, dated the same day, which confirmed he received treatment on September 20, 2017. Notably, this second report included details regarding Mr. Singh's injuries: "He was bleeding from his mouth and had bruises on his body parts."

Mr. Singh also presented additional evidence to support his claim for asylum including a statement from a district president of the SADM party noting Mr. Singh's active political participation

and the party's tension with the BJP. He also provided 2017 and 2018 reports from the Human Rights Watch, which documented vigilante violence often perpetrated by the BJP against religious minorities like the SADM party.

## B

At his merits hearing, Mr. Singh testified to many of the same facts provided in the various sworn statements. He explained that he genuinely feared for his life due to his affiliation with the SADM party and his prior violent encounters with the BJP. His testimony regarding the two specific attacks detailed in the various affidavits was consistent: he noted the same date of the attacks, the same methods used by the BJP members to carry it out, and his actions following these encounters including his attempt to report the first attack to the police and his visits to the hospital after both beatings.

But Mr. Singh also testified about matters beyond his membership in the SADM party and his interactions with the BJP. Mr. Singh stated that his highest level of education in India was twelfth grade. Additionally, he testified that in September of 2013, he applied unsuccessfully for a work visa to come to the United States. He explained that at the time, he was working with a company and had applied to come to the United States through that company. The government then introduced Mr. Singh's visa application from 2013 as impeachment evidence. Mr. Singh's visa application stated that Singh had attended Guru Nanak Engineering College from June 2003 to April 2007, and listed his course of

study as "Bachelor of Technology [in] Computer Science." The application also stated that he was employed by a company called Global Telelogic, which was paying for him to enter the United States to attend a business conference. The form also indicated that no one assisted Mr. Singh in preparing the application.

When asked why the highest level of education he received differed between his work visa application (which stated that he studied computer science at a college) and his Form I-589 (which stated that his highest level of education was twelfth grade), Mr. Singh explained that he had completed some coursework towards his bachelor's degree but never finished, and therefore he only included his completed education in his Form I-589. He also stated that the visa application was filled out through or by his company.

But there was a bit of confusion about the name of that company and Mr. Singh's work history more generally. When asked why his job in his visa application (which stated that he worked at Global Telelogic in 2013) was inconsistent with his job history in his Form I-589 (which stated that he worked as a farm hand in 2013), Mr. Singh explained that he worked as a seasonal farm hand and then would work at the company. Then, when Mr. Singh was asked about his work in computer science, he responded that he used to work at a company called "Wipe." The government pointed out that the visa application said his employer was called Global Telelogic, to which he responded, "Yes, that was the name of the company." When asked about the absence of Global Telelogic from his work history in his Form I-589 applica-

tion, Mr. Singh testified that he did not include it in the application or mention it in his earlier testimony because he only worked there for about a year and forgot.

Mr. Singh said that he stopped working for Global Telelogic in 2014, when he opened his shop. He stated that his visa application was prepared by the company, and that he told them he was studying for a bachelor's degree but not that he had obtained one. When the IJ asked how he could have still been working toward the degree in 2013 when the visa application stated he had attended college from 2003 to 2007, Mr. Singh responded, "I had told my company that and afterwards they are the ones who created the documents." After being pressed by the IJ, Mr. Singh tried to clarify that he was not working toward his degree in 2013, and instead was exclusively working as a salesperson for Global Telelogic.

## C

The IJ issued an oral decision denying Mr. Singh's claims and ordering him removed to India. The IJ made an adverse credibility finding against Mr. Singh. The IJ cited inconsistencies in Mr. Singh's employment and education history from his testimony, Form I-589 application, and visa application in making the credibility determination.

The IJ gave very little weight to Mr. Singh's corroborating evidence. According to the IJ, most of the information contained in the three affidavits was a secondhand recounting of Mr. Singh's

statements. Specifically, the IJ found the statements of Narinder Kaur (Mr. Singh's wife) regarding the BJP and police threatening her in July 2018 to be implausible because it "defie[d] logic that a government who is seeking out to harm [Mr. Singh] and who also has access to the whereabouts of all of its citizens through a central identification system would wait ten months after [Mr. Singh] was last attacked and eight months after he left India to inquire about his whereabouts." A.R. at 48. The IJ also gave little weight to Sukhwinder's affidavit, because it failed to establish what he actually witnessed about the first attack and its aftermath. The IJ also discounted Mr. Singh's medical documentation because it was not made contemporaneously with either attack.

Because the IJ did not find Mr. Singh to be credible and found his corroborating evidence insufficient to meet his burden of proof, the IJ denied Singh's applications for asylum, withholding of removal, and CAT relief. Alternatively, the IJ held that even if Mr. Singh were credible, he would not have met his burden for asylum, withholding of removal, or CAT relief because Mr. Singh failed to show a causal nexus between the harm he suffered and his involvement with the SADM party.

Mr. Singh filed a notice of appeal to the BIA, arguing that his testimony and supporting evidence established that he had suffered past persecution and had a well-founded fear of future persecution, and that he would more likely than not be tortured if removed to India. He further argued that the inconsistencies noted by the IJ were not material to his claims for relief and that he

21-10404                Opinion of the Court                11

had provided detailed and consistent testimony in support of his claims.

The BIA dismissed Mr. Singh's appeal concluding that the IJ's adverse credibility finding was not clearly erroneous and was based on specific, cogent reasons, including inconsistencies in Mr. Singh's testimony compared to other evidence in the record. The BIA also agreed with the IJ that Mr. Singh's corroborating evidence failed to sufficiently rehabilitate his testimony or independently satisfy his burden of proof. Accordingly, the BIA held that Mr. Singh did not show he was eligible for asylum, withholding of removal, or CAT relief.

Mr. Singh subsequently petitioned for review of the BIA's decision.

## II

We review only the decision of the BIA, "except to the extent the BIA expressly adopts the IJ's opinion." *Lopez v. U.S. Att'y. Gen.*, 504 F.3d 1341, 1344 (11th Cir. 2007). Generally speaking, issues not reached by the BIA are not properly before us. *See Gonzalez v. U.S. Att'y Gen.*, 820 F.3d 399, 403 (11th Cir. 2016).[3]

---

[3] Mr. Singh challenges the IJ's determination that there was no causal nexus between the violence Mr. Singh suffered at the hands of the BJP and his political affiliation with the SADM party. The BIA did not address this finding in its decision and based its affirmance of the IJ's decision solely on the adverse credibility determination and the lack of rehabilitative or independent corroborating evidence to satisfy the requisite burdens of proof for Mr. Singh's

Factual determinations, which include credibility determinations, are reviewed under the substantial evidence test. *See Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1254–55 (11th Cir. 2006). Under this highly deferential standard, we must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole. *See I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). The substantial evidence test requires us to "review the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." *Ruiz*, 440 F.3d at 1255 (quotation marks and citation omitted). Accordingly, a finding of fact will be reversed only when the record "compels" it, and not merely because the record may support a contrary conclusion. *See id.* (quotation omitted).

## III

Mr. Singh contends that the BIA erred when it affirmed the IJ's adverse credibility determination. Specifically, he argues that the alleged inconsistencies in his work visa, Form I-589, and testimony regarding his education and work history were not material to his claim, and that the IJ failed to give his corroborating evidence enough weight before determining that it did not rehabilitate his testimony. Mr. Singh also claims that BIA erred in denying his application for withholding of removal and CAT.

---

asylum, withholding of removal, and CAT claims. Because the BIA did not address the nexus issue, it is not properly before us.

## A

An IJ may base a credibility finding on the totality of the circumstances, including: (1) the demeanor, candor, or responsiveness of the applicant; (2) the inherent plausibility of the applicant's account; (3) the consistency between the applicant's written and oral statements; (4) the internal consistency of each statement; and (5) the consistency of the statements with other record evidence, including State Department reports. *See* INA § 208(b)(1)(B)(iii), 8 U.S.C. § 1158(b)(1)(B)(iii). An adverse credibility determination may be based on inaccuracies, inconsistences, and falsehoods, "*without regard* to whether [they] go[ ] to the *heart* of the applicant's claim." *Id.* (emphasis added).

The BIA did not find the IJ's adverse credibility determination to be clearly erroneous, noting that the IJ based the finding on "specific and cogent reasons." *Chen v. U.S. Att'y. Gen.*, 463 F.3d 1228, 1231 (11th Cir. 2006). The IJ placed particular importance on the inconsistencies between Mr. Singh's 2013 visa application, his From I-589, and his testimony regarding his education and work history. "For example, the [IJ] noted that although the respondent's asylum application indicates that the highest level he attended in school [was] the [twelfth] grade, a non-immigrant visa application submitted by the respondent in 2013 indicates that he attended college to obtain his bachelor of technology in computer science between 2003 and 2007." BIA Decision at 1. When the IJ subsequently asked Mr. Singh to clarify this inconsistency, Mr. Singh explained that he never finished col-

lege and thus only included his highest, *completed* level of education in his I-589. The IJ found this explanation "unpersuasive" because the asylum application "was open-ended and allowed for [Mr. Singh] to include attendance at schools, not just completed course study. *Id.* The BIA noted that the reasons the IJ provided for this conclusion were specific and cogent. Although we disagree with the IJ's credibility finding, we similarly find no error that compels reversal.

The IJ was equally unpersuaded by Mr. Singh's explanations regarding the inconsistencies in his work history. When Mr. Singh corrected himself about the proper name of the company he worked for in 2013 when he applied for his work visa, he explained that he had only worked there for a short period of time, which is why he didn't include it in his in his asylum application. He also said that the company helped him complete the visa application on his behalf. The IJ found these explanations to be unpersuasive and the BIA found no error in that conclusion. Neither do we.

Mr. Singh argues that these inconsistencies were not material to his claims and did not, considering the totality of the circumstances, show that his testimony was not truthful. But an IJ can base an adverse credibility determination on *any* inconsistency, regardless of whether or not it goes to the "heart" of the claim. *See* INA § 208(b)(1)(B)(iii), 8 U.S.C. § 1158(b)(1)(B)(iii). *See also Chen*, 463 F.3d at 1233 (rejecting respondent's claim that the inconsistencies and discrepancies noted by the IJ were "trivial"

and "irrelevant to the dispositive issues"). The BIA therefore rejected Mr. Singh's contention that the inconsistencies were immaterial to his claim and found that the "existence of the inconsistencies between two official United States Government documents submitted by [Mr. Singh] raise[d] significant questions" about his credibility. BIA Decision at 2. Though Mr. Singh was consistent regarding his violent encounters with the BJP, the law does not limit our inquiry to inconsistencies central to his claims.

## B

"Of course, an adverse credibility determination does not alleviate the IJ's duty to consider other evidence produced by an asylum applicant." *Forgue v. U.S. Att'y. Gen.*, 401 F.3d 1282, 1287 (11th Cir. 2005). However, once an adverse credibility determination has been made, "the burden is on the applicant alien to show that the IJ's credibility decision was not supported by specific, cogent reasons or was not based on substantial evidence." *Id. See also D–Muhumed v. U.S. Att'y Gen.*, 388 F.3d 814, 819 (11th Cir. 2004) ("The IJ provided cogent reasons for his credibility determination and those reasons are supported by substantial evidence in the record much like any factual determination.") (internal quotation marks and citation omitted).

The BIA noted that the IJ "properly gave limited weight" to Mr. Singh's corroborating evidence. BIA Decision at 2. Particularly, the BIA underscored the IJ's determination that the three affidavits submitted by Mr. Singh were not based on personal knowledge and that the medical documentation offered to bolster

his claims were not created contemporaneously with the treatment he received. The BIA did not find that the IJ erred in determining that Mr. Singh's corroborating evidence did not rehabilitate his testimony. *See Yang v. U.S. Att'y. Gen.*, 418 F.3d 1198, 1201 (11th Cir. 2005) ("[T]he IJ's administrative findings of fact are conclusive unless a reasonable factfinder would be compelled to conclude to the contrary.").

Again, our view of the evidence differs from that of the IJ. For example, the IJ seemed to have a preconceived timeline for when violent attacks can realistically occur and thought it "defie[d] logic" that the BJP would come looking for Mr. Singh months after they last attacked him, even though they allowed months to pass between the two documented beatings. *See* A.R. at 48. Nevertheless, given the highly deferential standard that applies, we do not find that the record compels reversal of the IJ's factual findings with respect to the insufficiency of Mr. Singh's corroborating evidence in the face of an adverse credibility determination.

## C

To succeed in his claim for withholding of removal under the INA, Mr. Singh must show that his "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." See INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A). "The burden of proof for withholding of removal, however, is "more likely than not," and, thus, is "more stringent" than the standard

for asylum relief." *Ruiz*, 440 F.3d at 1257 (quoting *Sepulveda v. U.S. Att'y. Gen.*, 401 F.3d, 1226, 1232 (11th Cir. 2005)). "[I]f an applicant is unable to meet the well-founded fear standard for asylum, he is generally precluded from qualifying for…withholding of deportation." *Mazariegos v. U.S. Att'y Gen.*, 241 F.3d 1320, 1324 (11th Cir. 2001) (quotation marks and citation omitted).

An applicant seeking CAT relief must establish "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). An applicant who is unable to meet the well-founded fear standard for asylum is generally precluded from qualifying for CAT relief. *See Forgue,* 401 F.3d at 1288 n.4.

Given that Mr. Singh did not satisfy his burden of proof for asylum, "it necessarily follows that he has not satisfied the burden of proof for withholding of removal or protection under the Convention against Torture." BIA Decision at 3. There is thus no basis to reverse the IJ's determination that Mr. Singh is not entitled to withholding of removal or relief under CAT.

## IV

The IJ's credibility determination is supported by substantial evidence, and this record does not *compel* us to reverse. Because Mr. Singh has not met his burden for any of the forms of relief he seeks, we deny his petition.

**PETITION DENIED.**